UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 10-CR 20763-LENARD/GOODMAN

UNITES STATES OF AMERICA,

    Plaintiff,

vs.

HENRY DE JESUS LOPEZ LONDONO,

    Defendant,

_____/

## **MEMORANDUM OF LAW**

COMES NOW, the Defendant, HENRY DE JESUS LOPEZ LONDONO, by and through undersigned counsel and submits this Memorandum of Law as per the instructions of United States Magistrate Judge Jonathon Goodman during the hearing on Defendant's Revised Verified Motion for In Camera Inspection of Grand Jury Minutes held on April 19, 2017.

### **QUESTIONS PRESENTED:**

*Question 1: Whether a Grand Jury needs to be advised that a defendant had been instructed to infiltrate a criminal organization and had committed crimes in order to further his ability to effectively infiltrate the organization and provide meaningful information to law enforcement officials.*

Given the particularity of the issue presented by the Court, it was unlikely that a case would surface that would answer this question with precision. Some came close but only by way of their factual differences with the instant case. For example, in *United States v. Strahan*, 565 F.3d 1047 (7th Cir. 2009) the Seventh Circuit affirmed a drug distribution conviction of a defendant who sought a jury instruction on the public authority defense. While it had been revealed at trial that the defendant occasionally provided police with information regarding fugitives on the street, he had never given information regarding narcotics and by his own admission had never been authorized to sell drugs. The court found this evidence insufficient to

1

support an instruction on the public authority defense. Given the extent to which Strahan's facts and relief sought differ from ours, this case fails to address the issue.

*United States v. Boffa,* 89 F.R.D. 523 (Del. 1981) is another case which approximates our facts, but not enough for its light to reach our issue. In *Boffa,* defendants moved for a pretrial evidentiary hearing into the Government's grand jury presentation concerning co-defendant Robert Rispo, who was revealed to have been a government informant. Because Rispo's status as an informant was suppressed, the defendants claimed, the grand jury "was in no position to make an independent determination of whether (Rispo's) deeds and declarations, attributable to his co-defendants on an enterprise-conspiracy basis, had actually been the deeds and declarations of the Government itself." See *Boffa* at 529. Rispo was not a party to the motion because he had already reached a deal with prosecutors and was slated to testify against his co-conspirators. Thus, he raised no public authority defense and the court noted that the withholding of Rispo's status as an informant would hardly exculpate his cohorts such that it would have obligated prosecutors to disclose it to the grand jury. ("The Court cannot discern how disclosure of Rispo's informant status to the grand jury would have exculpated his co-defendants, much less how this fact would have persuaded the grand jury not to indict.") Thus, on its facts *Boffa* offers little guidance on the issue presented.

However, it does point to what Defendant Lopez-Londono would submit is the critical inquiry in this matter: would disclosure of Defendant's status as an undercover informant, given the facts unique to his case, have altered the determination of the grand jury? We submit it would have and that the disclosure of the Defendant's cooperation status to the grand jury was necessary context to determine the probability of his alleged crime.

"Where a prosecutor is aware of any substantial evidence negating guilt he should, in the interest of justice, make it known to the grand jury, at least where it might reasonably be expected to lead the jury not to indict." *United States v. Ciambrone*, 601 F.2d 616, 623 (2nd Cir. 1979). The Government should be well acquainted with this principle since it is codified in the ABA Standards for Criminal Justice: The Prosecutor Function at 3-3.6(b): "No prosecutor should knowingly fail to disclose to the grand jury evidence which tends to negate guilt or mitigate the offense."

An analysis of Defendant's case, the fact that he is charged in a single count of conspiracy, the oblique nature of the allegations against him, together with his evidentiary submissions herein and under previous cover, lead to the conclusion that, had the Grand Jury been told that the Defendant was a registered undercover cooperator with U.S. authorities, the Defendant's indictment would be cast into serious doubt.

In the hearing on April 19th, the Court aptly noted that there is a legal distinction between providing information to the government and being authorized to participate in organizational criminal activity on its behalf. As explained by undersigned counsel at the hearing, however, Defendant's case blends the two in a way that required Defendant to infiltrate the Urabenos to an extent that would, in the absence of public authority, expose him to a conspiracy charge in order to provide the kind of information U.S. Government agents instructed him to obtain.

Based on email evidence provided herewith as an exhibit, we know for certain that Defendant was first propositioned to undertake infiltration missions of criminal bands in Colombia while he was in Argentina by agents of the Department of the Treasury (IRS) through their paid contractor Roberto Luna as early as November of 2008 (See Lopera/Luna emails; Composite Exhibit Ex A). These emails refute the contention that the Defendant was already a member of the

Urabenos when he came into contact with the government's agents and their oft repeated claim that it was the Defendant who sought out the agents not vice-versa.[1] At the time, the Defendant was in Argentina and was pursuing an asylum claim for himself and family when he accepted the proposal of the government to engage in a "project" of infiltration (the quid pro quo for this mission was the eventual asylum of the Defendant and his family in the USA).  After the Defendant's commencement of his infiltration mission, this project was turned over and adopted by agents Steve Monks and Frank Burrola of Immigration and Customs Enforcement (ICE) who not only explicitly gave their blessings to the Defendant's activity but informed him that the "project" had been officially approved by Washington.[2]  Finally the Drug Enforcement Administration took over the project by their Bogota DEA agents Alex Navarro and Jorge Rodriguez.

Each of these agencies formally authorized or approved him to undertake and/or continue his infiltration missions, from no later than September 2010, by the Government's own admission. After ICE Agent Steven Monks informs the Defendant that he has received official authorization to work with the Defendant, he describes what he wants by stating that he is interested in "making seizures and arrests of criminals, not necessarily of high rank", and asks the Defendant "if you have the capacity to provide detailed information regarding houses where they hide contraband like drugs, cash, arms" and states that he "hopes that with your contacts you can find out where this is happening." Monks specifically asks for the Defendant's cooperation in the seizure of large

---

[1] One particular email and translation dated February 3, 2009, together with a series of emails between the IRS contractor Roberto Luna and the Defendant's Colombian lawyer Eduardo Lopera Hernandez, reflect that it was the Defendant who accepted the government's proposal and that he sent his American lawyer to verify the official nature of the agreement and its terms.  His lawyer met with and discussed the Defendant's cooperation with IRS agent Santiago Aquino at the Miami meeting.

[2] See Composite Exhibit B; BlackBerry Messenger texts in which ICE agent Steve Monks specifically informs the Defendant known as "Assis" that he had received "official" authorization to work with the Defendant.

amounts of drug cash, to which the Defendant responds that in order to obtain such a thing that there must be "infiltration" and "interaction" with the persons on the street.[3] The agent specifically answers in the affirmative. (See Ex B; Monks/ Assis BBM's).

These are not words soliciting mere information. These are instructions for active measures authorized by U.S. law enforcement along with its concomitant legal protection. Monks himself highlights the need to use Defendant's "contacts" to obtain the kind of information he seeks; information the type of which Defendant provided directly to ICE Agent Frank Burrola on the night of September 30th, 2010 regarding the imminent dispatch of a go-fast vessel loaded with cocaine from the Gulf of Uraba:

> **DEFENDANT**: *My friend, I apologize for the late hour, the thing is Fernando [another agent] doesn't answer his phone. We were trying to take down a boat and it just left five minutes ago en route to Panama if you can please advise. Thanks, my friend.*
> **BURROLA**: *I'm locating it, my friend. I will let you know. I'm in communication with Panama.*
> **DEFENDANT**: *Good to know. It's black with black engines carrying 1597 kilos. Thanks for your time.*
> **BURROLA**: *Did it leave from the Pacific or Caribbean? Is the boat in the Pacific or the Atlantic? Give me all the information you have.*
> **DEFENDANT**: *It left from the Gulf of Uraba from the City of Mulatos en route to Panama.*
> (See Exhibit C; BBM messages between Defendant and ICE Agent Frank Burrola)

The Defendant could not have been expected to furnish this quality of intelligence without integrating into this criminal organization.[4] Then and only then could Defendant hope, as the

---

[3] It should be noted that the original IRS project called for the Defendant to offer 2 million dollars to criminal organizations in exchange for monies in Mexico as a means to move money to Colombia.

[4] The emails between Lopera and Luna together with the extradition affidavits put the lie to the Government's allegation, made in open court, that Defendant returned to Colombia in early 2009 to join the Urabenos at the behest of a drug kingpin known as "Don Mario". An email dated Nov. 24, 2008 shows Defendant's attorney concreting his desire to "engage in the project and cooperate". (See Exhibit A). The Kibble affidavit, meanwhile, alleges that Defendant was "one of the leaders" of the Urabenos going as far back as October of 2006. To allege that Defendant

Government hoped, to put his "contacts" to use in order to effect the "seizures and arrests" the Government so desired.

It almost worked too well. As we can see from the affidavits in support of the various extradition requests in this case, the specific allegations underlying the sole conspiracy charge against Defendant are mostly ones of association: a confidential informant (CS-1) who transported cocaine "on behalf of" Defendant from the Gulf of Uraba to Panama -- information identical to what he was providing ICE contemporaneously (See Exhibit D; Affidavit of Kristine Kibble at pp. 9); Defendant and co-conspirators "would meet with CS-1" to discuss transportation fees and quantity of shipments (pp.10); CS-1 "met with" Defendant and others at a farm in Uraba to discuss drug shipments with ultimate destination in the U.S.; Defendant explained to CS-1 that he'd have to "meet with Jhon Giraldo-Usaga" aka Simon, one of the first to be indicted in this case and well before Defendant was even known to law enforcement. In a subsequent paragraph, Kibble alleges that CS-1 later met with Simon who was there "at the request of" Defendant (pp.13).

These allegations of Defendant's undifferentiated presence at "meetings" coupled with the total lack of any direct evidence against him square with his role as a Government asset sufficiently immersed to do as his handlers bid, but no more. The Government's own evidence bears this out. In the more than 20+ hours of CI video recordings of the co-defendants, Defendant never once appears and is only regarded in passing mention. Government's allegation that he was a leader of the Urabenos is belied by ICE's own leadership chart where Defendant is notably absent. (Exhibit E) Where it alleges that Defendant met with members of the FARC in June 2008[5]

---

joined the Urabenos in 2009 at the behest of Don Mario while alleging that he had been a leader of the Urabenos since October 2006 is a self-contradiction that should call the Government's entire case into question.

[5] See Exhibit D; Kibble Affidavit, (pp. 28)

to negotiate the sale of 2000 kilos of cocaine base, immigration records show that he was in Argentina, having just sought asylum three months prior. (Exhibit F).

Which brings us back to the original question: if the Grand Jury had been told that at all times relevant to this conspiracy, as alleged, that Defendant was a U.S. Government asset tasked with infiltrating the Urabenos in order to obtain information leading to seizures and arrests, could this lead the jury not to indict? The answer is resoundingly in the affirmative. The prosecutors who brought this indictment knew Defendant was working for the U.S. They also knew that if they told the Grand Jury, it could jeopardize their indictment. The jurors could determine that Defendant's alleged conduct squared with his mission and the scope of his authorization. Admittedly, they could have determined that Defendant exceeded the scope and subjected himself to criminal liability. But at least the Grand Jury would have been trusted with the full and necessary compliment of facts with which to deliberate. In denying the Grand Jury the chance to make that determination, it denied the Defendant his right to due process and renders his indictment constitutionally infirm.[6]

*Question #2: Whether the grand jury should have been advised of the PA defense when facts about the timing of the Defendant's membership in a criminal organization later were in dispute.*

In almost every criminal case there will be some variance between the government's facts before the grand jury and those that are subsequently established at trial. That such a variance exists on the question whether or not the Defendant joined the criminal organization before he became a registered confidential informant would not have required the government at the time of

---

[6] Please note that in addition to Exhibits A through F which are referenced in this pleading, undersigned counsel is also attaching the other exhibits that supported the undersigned's presentation at the hearing on April 24, 2017; they are as follows: Exhibit G – Notice of Absolution of all criminal charges in Colombia; Exhibit H – Summaries of meetings in Colombia between DEA, ICE, and Defendant; Exhibit I – Letter from Argentine counsel re: Defendant's pending asylum claim; Exhibit J – Notice of Withdrawal of Warrant against Defendant in Colombia.

the founding of the indictment to have provided the grand jury with an alternate version of the facts. In other words, the government is not required to present a defense version of the facts to the grand jury. However, that is a different question from the one raised by the suppression by the prosecution of the fact that the Defendant at some point was a registered confidential informant who by all accounts provided valuable cooperation during the period of time of the indictment. A factual dispute does not provide shelter to the government from its obligation to provide essential facts to the grand jury. The case law makes clear that the government is not entitled to its own facts, and that it has a legal obligation to provide accurate and truthful facts when necessary for the grand jury to perform its constitutional function. Said another way the government may not knowingly suppress facts necessary to the deliberative function of the grand jury. There is no dispute that at some point the Defendant did become a valued confidential informant. A subsequent dispute on some aspect of his cooperator status is not an excuse for the government's complete and willful manipulation of the facts in order to obtain an indictment in this case.[7] See: *United States v. Sigma Intern,* Inc. 244 F.3d 841 (11th Cir. 2001) ( In an opinion that was subsequently vacated where parties ultimately settled and the appeal dismissed, the Eleventh Circuit ordered an indictment dismissed and offered the observation: "Where a grand jury proceeding is so corrupted by the conduct of a prosecutor or judge that it substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from substantial influence court's should not hesitate to remedy the violation because the indictment is not of the grand jury.").

---

[7] Undersigned counsel researched the second question presented by the Court and found no cases on point.

Respectfully submitted,

By: */s/Arturo V. Hernandez, Esq.*

ARTURO V. HERNANDEZ P.A.
40 N.W. 3rd Street, Suite 200
Miami, Fl., 33128
Tel: 305-579-4850
Fax: 305-381-6869
E-mail: avhlaw@bellsouth.net
FL Bar No.: 0324078

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that he filed the above motion with the Court's electronic filing system which will provide notice to all parties. In addition, undersigned counsel emailed this motion to government counsel on April 28, 2017.

Respectfully submitted,

By: */s/Arturo V. Hernandez, Esq.*