UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-CR-20763-GRAHAM(s)

UNITED STATES OF AMERICA

v.

HENRY DE JESUS LOPEZ LONDOÑO,

      Defendant.
_____/

## GOVERNMENT'S FIRST NOTICE OF EXPERT TESTIMONY

Pursuant to FED. R. CRIM. P. 16(a)(1)(G), the United States of America, by and through the undersigned Assistant United States Attorney, hereby provides notice of the government's intent to use expert testimony in its case-in-chief at trial.  The following is the expert the government intends to call at trial and a summary of the expert's opinions, the bases for those opinions, and the witness's qualifications.

**Derek R. Sousa, Intelligence Research Specialist, Drug Enforcement Administration (DEA)**

Specialist Sousa is an experienced law-enforcement officer, who is presently assigned to the DEA Miami Field Division in Weston, Florida.  Specialist Sousa has over fourteen (14) years' experience as a law-enforcement officer.  Prior to joining DEA, Specialist Sousa earned a Bachelor of Arts degree in Political Science from the University of Massachusetts, Dartmouth, where he graduated summa cum laude.  He then received a master's degree in Public Administration from Suffolk University in Boston, Massachusetts, where he again graduated summa cum laude.  His law enforcement experience, which includes over 7 years working in the DEA Bogota, Colombia Country Office and an additional 2 years in Arlington, Virginia, where he focused on Mexico,

1

Central America, the Caribbean, and South America, covers numerous drug and money laundering investigations, including the importation and distribution of cocaine. Specialist Sousa's knowledge regarding money laundering and the importation and distribution of various illegal drugs, including cocaine, is also based on intelligence briefings, case and operations briefings, wiretap information, business records, foreign government briefings and debriefings of hundreds of cooperating witnesses. He has received numerous accolades from DEA, including receiving a DEA Exceptional Performance Award over multiple years, and has provided briefings regarding drug trafficking to various U.S. Attorney's Offices, foreign political dignitaries, and the President of the United States. Based on his training, experience, and knowledge, Specialist Sousa will testify about the places of origin for cocaine, the methods and means by which cocaine is imported and distributed, and the value of cocaine.

Among other things, the government expects that Specialist Sousa will testify that:

1. A drug shipment that is over 50 kilograms of cocaine is considered a large quantity by the Drug Enforcement Administration ("DEA"). When large shipments of narcotics like this are transported from Colombia or Venezuela to a location north of those countries -- such as to a location in Honduras or other countries in Central America, it is well known that at least part of the narcotics from those shipments is eventually imported into the U.S. and sold in the U.S.

2. There are two reasons for this. First, the U.S. is the most profitable market for narcotics and therefore the most likely way for a narcotics trafficker to earn a profit from drug dealing. There are a lot of expenses for narcotics traffickers, including: (i) costs for the transportation such as boats, cars, trucks, planes and fuel; (ii) costs to hire people to

handle the transportation; (iii) costs to store and hide the drugs; (iv) costs for security; (v) costs to bribe certain law enforcement and public officials so that drugs are not discovered and seized; and (vi) then there are even more costs to move large, bulk cash so that when drugs are successfully sold, the narcotics trafficker can get their money.  And all of these costs go up as the amount of narcotics becomes greater.  For example, it costs more money to store and hide 500 kilograms of cocaine than it does to hide 50 kilograms of cocaine.  Because of all the expenses of secretly transporting such large loads north, drug traffickers have to sell at least some portion of the drugs for the highest possible price, which is the price in the U.S.

3.   For this same reason, the value of a kilogram of cocaine increases as it moves from Colombia to the U.S.  As it moves north, the price of the kilogram takes into account all the costs that have been spent so far, which go up as the kilogram moves north from country to country, and it takes into account that, by being closer to the U.S., it is more likely to be sold profitably rather than being discovered and seized.

4.   So, in 2014 and 2015, the price for a good quality kilogram of cocaine in Colombia was about $2,000 to $2,500.  That same kilogram would be sold in Honduras for about $8,000 to $13,500.  In Mexico, that same kilogram would be sold for about $15,000 to $20,000.  And in the U.S., depending on where in the U.S., it would be sold for about $23,000 to $36,000.  Those are all wholesale prices for the kilogram.

5.   When the kilogram gets to the U.S. and drugs are sold on the street, the retail value of that cocaine is even higher.  The good quality cocaine brick is broken down and mixed with other ingredients so that the one good quality kilogram becomes two

average quality kilograms. And average quality cocaine is what is sold on the street in small quantities. So the retail value of that one good kilogram of cocaine in the U.S. is between about $46,000 and $72,000, and that is a good profit for a kilogram of cocaine that started in Colombia being worth about $2,000 to $2,500.

6. The second reason it is well known that at least part of the narcotics from those shipments is eventually imported and sold in the U.S is because the U.S., which has a much larger population than all of those of countries, is the only country north of Colombia that would have a demand for narcotics that is big enough to absorb such a large quantity of narcotics. In fact, markings from kilograms of cocaine seized in Central America are often found on kilograms of cocaine seized in the U.S.

7. And, as more proof that at least part of the narcotics from those shipments is eventually imported and sold in the U.S., DEA agents have seized U.S. dollars in Mexico and Central America that have been moving on a path south. Agents have also learned that narcotics traffickers in South and Central America often use large sums of U.S. dollars in their drug transactions.

Such testimony by an experienced law-enforcement officer "help[s] a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business." United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006); United States v. Emmanuel, 565 F.3d 1324, 1335 (11th Cir. 2009) (the operations of drug dealers are proper subjects of expert testimony); see also United States v. Jones, 44 F.3d 860, (10th Cir. 1995)(expert testimony regarding the value of drugs is relevant to prove the drugs were intended for distribution); United States v. Tapia-Ortiz, 23 F.3d 738, 741 (2nd Cir. 1994)(same).

4

Having made this disclosure, the government hereby demands a written summary of expert testimony the defense reasonably expects to offer at trial pursuant to FED. R. EVID. 702, 703 or 705, describing the witnesses' opinions, the bases and the reasons for those opinions, and the witnesses' qualifications.

    Respectfully submitted,

    BENJAMIN G. GREENBERG
    ACTING UNITED STATES ATTORNEY

By:    s/ *Robert J. Emery*
    ROBERT J. EMERY
    Assistant United States Attorney
    Court ID No. A5501892
    99 Northeast 4th Street
    Miami, Florida 33132-2111
    Telephone: 305-961-9421
    Email: Robert.emery2@usdoj.gov

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on October 11, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*s/ Robert J. Emery*
Assistant United States Attorney
