IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO:  10-CR-20763-LENARD/GOODMAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

HENRY DE JESUS LOPEZ LONDONO,

    Defendants.

_____/

## DEFENDANT'S RE-FILED[1] MOTION TO DISMISS THE INDICTMENT AND REQUEST FOR EVIDENTIARY HEARING

COMES NOW, the Defendant, Henry de Jesus Lopez Londono, and respectfully requests

this Honorable Court, dismiss the superseding indictment for destruction of evidence and

prosecutorial misconduct resulting in a denial of due process. Defendant also respectfully

requests this Honorable Court conduct an evidentiary hearing to determine certain factual issues

out below. Lastly, Defendant would ask for leave to supplement this pleading based upon this

Court's pending rulings on his Rule 16 discovery motions and the Appeal of his Motion for In

Camera Inspection of Grand Jury Minutes.  In support of his Motion to Dismiss the Superseding

Indictment and the other relief sought herein, Defendant would state as follows:

## I. The Government's destruction of the Blackberry phones used by federal agents to communicate with Defendant during his intelligence gathering activities in Colombia

---

[1] On August 29, 2017, Defendant filed a notice of withdrawal of this motion without prejudice because Defendant and the Government had reached an agreement in principle that would have resolved this case. At the time of Defendant's withdrawal, the Government was obligated to provide further responses to the Court pursuant to Magistrate Judge Goodman's sealed order of August 23, 2017. On October 10, 2017, the District Court rejected the 11(c)(1) plea negotiated between the parties. As a result, Defendant now re-submits this Motion to Dismiss the Superseding indictment and asks that Magistrate Judge Goodman reinstate his prior order and require the Government to respond as before. This motion has already been fully briefed and the exhibits submitted previously under seal. But for this footnote, this motion appears entirely as it did when originally filed save for the redactions that obscure portions that are subject to the Court's protective order.

**constitutes a denial of due process, fundamental fairness, and the right to present a complete defense.**

Although still the subject of a pending Motion to Compel, the Government has admitted that the five blackberry phones used by federal agents Steven Monks, Frank Burrola, Alex Navarro, Jorge Rodriguez, and Fernando Plascencia in the course of Defendant's infiltration missions tasked by ICE and DEA were destroyed.[2]

As this Court is aware, Defendant intends to present a public authority defense arguing, *inter alia*, that the specific acts which the Government alleges were committed in aid of a conspiracy to traffic narcotics were, in fact, authorized by U.S. law enforcement. A critical part of that defense is establishing that the defendant received specific authorization to engage in certain illegal conduct necessary to effectuate his assigned tasks. Said another way, the success of a public authority defense hinges on establishing that the illegal conduct in question fell within the scope of his public authority.

The Blackberry message exchanges between the federal agents and the Defendant are not just the best evidence, but the ONLY evidence, that would establish what precisely the Defendant was tasked with, what conduct the agents authorized, and what Defendant was relaying to them as a result. In a case such as this one, in the absence of any objective inculpatory evidence, where the Government seeks to prove Defendant's part in the conspiracy by alleging his presence at meetings with drug traffickers or that he sent others in his stead,[3] the evidence that would most clearly exonerate him would be his communications with the agents.

---

[2] Government counsel Michael Nadler confirmed as much in a June 14, 2017 email to the undersigned, wherein he stated: "[T]he cell phones used by SA Monks and SA Burrola are no longer available for inspection. As far as we have been advised, those messages from the phones are no longer accessible or available." Government counsel has since confirmed that the other three phones belonging to DEA Agents Navarro and Rodriguez and ICE Agent Plascencia also have been destroyed.

[3] What little we know of the Government's allegations against Defendant are contained in the affidavit filed by DEA Agent Christopher Goumenis in support of Defendant's extradition from Argentina. The affidavit assumes that he is

Based on the evidence already adduced from the emails obtained under Defendant's

*Brady* requests and the limited Blackberry Messages that he was able to retain himself,[4] it is

clear that those message transcripts showed that the very conduct for which the Government

seeks to incarcerate him had been either ordered and/or authorized by the ICE and DEA.

Additionally, emails revealed through Defendant's demands for production under *Brady v.*

*Maryland*, 373 U.S. 83 (1963) showed that federal agents encouraged Defendant to leverage his

position within the Urabenos band in order to effect the Government's intelligence aims.[5] In

other words, they knew those messages would set him free.

We know that this is so because in October of 2010, while Defendant was still in the field

as a registered informant for ICE, federal prosecutors and DEA agents suddenly eager to indict

him were acutely aware of the threat a public authority defense could pose to their prosecution.

In an email to ICE Supervisor Frank Burrola, lead DEA Agent Chris Goumenis wrote that what

is "concerning" to the U.S. Attorney's Office and the DEA is whether Defendant provided any

information that could be ███████████████████████████████████ He further

wanted to know if any ███████████ were made to Defendant that ███████████

---

the leader of a major drug trafficking DTO and alleges various meetings between April 2009 and February 2012 in
which Defendant was in around drug traffickers. This was the height of his infiltration activities on behalf of ICE
and DEA. Affidavit is attached hereto as Exhibit A.

[4] See Defendant's BBM transcripts and translations attached as Exhibit B.

[5] The Brady emails referenced in this motion are organized by bates stamp number and are attached as Composite
Exhibit C. ███████████████████████████████████████████████

 or if any promises were made.[6] That same day,

Assistant U.S. Attorney Jared Dwyer also emailed Burrola reiterating Goumenis' concerns.

Burrola, while insisting that Defendant had been

thoroughly vetted, agreed to provide them ███████████████

The Defendant has every reason to believe that ICE Agents Monks and Burrola provided

everything they had, including the Blackberry phones used to communicate with Defendant, to

the prosecutors and DEA agents seeking his indictment. The Defendant has every reason to

believe that these prosecutors and agents evaluated the contents of those communications and

determined that in fact they DID present a roadblock to a successful prosecution. So they

destroyed the evidence. Agents and attorneys for the United States Government destroyed those

phones with the full and undeniable knowledge that they would constitute the most critical and

probative evidence supporting a public authority defense.

> **1.) The Government's destruction of evidence in this case constitutes a denial of due process given that the Government knew the evidence was apparently exculpatory, irreplaceable, and destroyed in bad faith. Accordingly, the indictment must be dismissed with prejudice.**

**Apparently Exculpatory**

When law enforcement agents have in their possession evidence that might be expected

to play a significant role in the suspect's defense, they have a constitutional duty to preserve that

evidence. *California v. Trombetta*, 467 U.S. 479 (1985), see also *Arizona v. Youngblood*, 488

U.S. 51 (1988) and *Illinois v. Fisher*, 540 U.S. 544 (2004). Evidence that is apparently

exculpatory must possess an exculpatory value that was apparent before it was destroyed and it

must also be of such a nature that the Defendant would be unable to obtain comparable evidence

---

[6] See BS#:000277
[7] See BS#: 000290

4

by any other reasonable means. *Trompetta* at 450. Where evidence is merely potentially exculpatory, a constitutional defect will only lie where Defendant can show that law enforcement acted in bad faith. *Youngblood* at 52.

The critical rule drawn from *Trombetta* is that destruction of evidence the Government knows to be exculpatory will cause a constitutional violation for want of due process. Where a Defendant can show that law enforcement knew the exculpatory value of certain evidence which then disappears, the indictment must be dismissed.

While the exculpatory value of the texts is self-evident in view of the facts of the case and Defendant's public authority defense, U.S. Magistrate Judge Goodman has already ruled that these messages are clearly exculpatory and needed to be produced under Brady.

> *Demand 5: Text messages between Londono and any government agent. The United States argues that Londono should be able to retrieve his own text messages, but he explained why he could not do that for many text messages. The United States explained that it would produce the text messages between Londono and information from ICE. But the United States shall also produce by May 12 all text messages in its possession between Londono and any government agent. In other words, the production obligation is not limited to material in ICE's possession. If information is in the possession of the DEA or IRS, for example, then these text messages need to be produced, as well.*

See D.E. 268.

In this case there can be no doubt that DEA agents were aware that the Blackberry phones and the Blackberry messages they contained were exculpatory based on the *Brady* emails which show that they knew Defendant was cooperating and wanted to identify and agglomerate any information supporting a public authority defense that would create an impediment to a successful prosecution. These are the words of DEA agents and federal prosecutors, not the Defendants.

To suggest that the Government could not have been aware of the exculpatory nature of ICE and DEA's communications with Defendant while he was in the field is preposterous. First, the Brady emails reveal that DEA and USAO received abundant notice from ICE agents that Defendant was an undercover asset. ICE Agents Monks and Burrola promised to provide all the information they had regarding the Defendant's cooperation and insisted that DEA's allegations about Defendant were specious in light of the fact that he had been fully vetted over the past year and had been signed up as a registered informant as recently as August. The emails also show that DEA and USAO were aware and indeed afraid of the evidence that could support a public authority defense. Second, at least one of the agents involved in the investigation and prosecution of Defendant, DEA Agent Jorge Rodriguez,[8] was one of the very same agents who was communicating with Defendant during his cooperation with ICE and DEA. Agent Rodriguez is referred to specifically in the small sample of BBM messages Defendant was able to preserve and the Brady evidence make repeated reference to Rodriguez as one of the agents in touch with Defendant.[9] Moreover, Agent Rodriguez was in a unique position to know the entire breadth of Defendant's cooperation with ICE and DEA as he was the Agent who drafted the DEA-6 report of Defendant's debriefing in Cartagena, Colombia in November of 2009.[10]

In an affidavit attached hereto as Exhibit D, defense expert witness Omar Aleman, a 30-year veteran of the DEA, states that such evidence of communications with an asset in the field would have had to be preserved and the fact that it was not is truly extraordinary. Moreover, he

---

[8] See BS#: 000283

[9] Attached hereto as Exhibit E. These messages, the few Defendant was able to retain, also show that he was providing real-time, actionable intelligence regarding the imminent dispatch of a maritime drug shipment from the Gulf of Uraba, Colombia to Panama in August 2010. Government correspondence acknowledges that this shipment was seized and four people arrested on the high seas.

[10] See BS#:000302-000304. Defendant disputes Rodriguez' account of the meeting, as stated in his affidavit in support of this Motion to Dismiss, attached hereto as Exhibit F.

6

asserts that DEA agents, even supervisors, are without authority to destroy evidence on their own and can only do so with the express permission of federal prosecutors.

The Brady emails show that the people responsible for bringing the instant superseding indictment knew about Defendant's cooperation with federal authorities at every level and from the beginning. They show that the federal law enforcement agents communicated their orders and received Defendant's intelligence via BBM which would have been the most critical evidence supporting a public authority defense. They show that prosecutors and DEA were afraid of the threat a public authority defense would pose to their prosecutorial evidence. Each of these facts on their own is sufficient to show that the federal officials seeking Defendant's indictment knew that the Blackberry phones contained exculpatory evidence. Taken together, they show a concerted effort to subvert the Defendant's right to due process of law.

**Bad Faith**

Though the trifecta of Supreme Court cases state that a showing of bad faith by law enforcement is not required where the destroyed evidence was apparently exculpatory, Defendant can nonetheless make such a showing which operates *a fortiari* in his favor.

The destruction of the evidence of Defendant's direct communications with law enforcement must be understood as one part of a more comprehensive effort to eliminate any trace of Defendant's status as an undercover informant. The Government hid his status from the Argentinian authorities during a four year extradition process. They hid it from the Grand Jury. When pressed on it, they treated it as fiction. When they admitted it, they said it was brief and fruitless.[11] Though the Government knew this evidence existed and needed to be disclosed, it

---

[11] The Government first acknowledged Defendant's cooperation with U.S. authorities on January 18, 2017 in its Response in Opposition to Defendant's Motion for In Camera Inspection for Grand Jury Materials [D.E. 217]. The Government alleged that his relationship was with ICE and it lasted from August 2010 to February 2011. This is false, as the Brady emails show, Defendant first began work with ICE in November of 2009 and not just with ICE

was only produced after the Court entered its order. The only evidence the Government provided

in its initial discovery response that in any way referenced his cooperation with authorities, were

summaries of his intelligence debriefings with ICE and DEA made to look like admissions that

would be used against him in the Government's case-in-chief.[12] Had Defendant gone to trial

armed simply with what the Government produced of its own volition, the only evidence a jury

would hear of his three year collaboration with U.S. law enforcement would be his own words as

rendered by an interpreter. The message was loud and unmistakable: "You will enjoy no

protection. Plead."

It is within this milieu that the destruction of these communications takes on the odor of

bad faith. The value of this evidence to Defendant and the need to destroy it were one in the

same. In the Government's own words their purpose was to clear roadblocks to a successful

prosecution, not to determine whether a crime occurred. They had already determined he was

guilty.[13]

---

but DEA as well. His relationship with the U.S. Government began in earnest in fall of 2008 when agents with the Internal Revenue Service encouraged him to return to Colombia from Argentina and reintegrate with elements of his former AUC which had formed a new organization known as the Autodefensas Gaitanistas Colombianos (AGC). See Defendant's Affidavit.

[12] Attached as Exhibit G is a side by side comparison of "statements" provided by the Government as evidence-in-chief and the original intelligence reports upon which his "statements" were based. When seen side-by-side, it becomes clear that the Government sought to distort the original reports by stripping them of essential details to make them look like the admissions of a confessor rather than the product of earnest intelligence sharing between Defendant and his handlers. The Brady emails made clear that ICE and DEA agents were very enthusiastic about what Defendant had to offer calling it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ They then set about tasking him for new objectives and registering him as an official informant. See BS#: 000309

[13] See BS#:000269 - In a Brady email dated September 29, 2010 from DEA Regional Director Luis Perez to Agent Burrola, Perez stated: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Perez' mentioning that CNP (Colombian National Police) jointly spearheaded the investigation of Defendant corroborates his assertion that the true cause for the termination of his cooperation and indictment was pressure from Colombian authorities who became alarmed when they learned that Defendant was giving information to U.S. authorities about corruption among Colombian officials and that ICE was beginning to move on that intelligence.

A public authority defense is nothing if not a compilation of words; words communicated by an authorized official conferring that authorization onto an agent. Erase those words, and you erase the defense.

**Irreplaceable Evidence**

It should be obvious that Defendant has no other way of obtaining this evidence. While the Government has tried to argue that Defendant should have to produce this evidence himself, U.S. Magistrate Judge Goodman roundly rejected it, noting that Defendant would have had to delete those communications from his phone continually as a matter of survival.[14] The Government, on the other hand, was subject to a constitutional duty to preserve this evidence.

Thus, Defendant faces a trial on a single count of drug trafficking conspiracy deprived of his strongest, most exculpatory evidence. What exactly he was tasked with, what meetings he was told to attend, who he was told to get close to, what his handlers approved, what Defendant reported back; all of it now becomes vulnerable to conjecture and manipulation.

By destroying this evidence, the Government has damaged Defendant's right to due process of law beyond repair. As it crumbles, so too does this indictment. It should be dismissed.

**II. Prosecutors' misrepresentation of facts, mischaracterization of evidence, and omission of Defendant's status as a U.S. Government informant during the critical period of the alleged conspiracy before the Grand Jury amounted to prosecutorial misconduct sufficiently prejudicial to warrant dismissal of the superseding indictment.**

The United States Supreme Court has stated that a district court dismiss an indictment for prosecutorial misconduct pursuant to its supervisory power where it finds that such misconduct was prejudicial to the defendant. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255-56, 101 L. Ed. 2d 228, 108 S. Ct. 2369 (1988). The Supreme Court has articulated the standard of

---

[14] See U.S. Magistrate Judge Goodman's Order, *supra*.

prejudice applicable to prosecutorial misconduct motions as follows: dismissal of the indictment is appropriate only when "if it is established that the violation substantially influenced the grand jury's decision to indict," or if there is "grave doubt" that the decision to indict was free from the substantial influence of such violations. Id. at 256 (citing *United States v. Mechanik*, 475 U.S. 66, 78, 89 L. Ed. 2d 50, 106 S. Ct. 938 (1986) (O'Connor, J., concurring in judgment). An exception to this required showing of prejudice is made in cases where the "structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." Id. at 257. In *United States v. Soberon*, 929 F.2d 935 (3d Cir. 1991), the Third Circuit stated that "the presentation of . . . allegedly perjured testimony to the grand jury does not fall into the narrow category of cases in which dismissal of charges without a showing of prejudice is warranted."

Defendant does not yet know what precisely the Grand Jury was told by federal prosecutors. Though he has appealed the Magistrate Court's ruling denying an in camera inspection of the Grand Jury materials, the available evidence allows Defendant to gainsay what the Grand Jury likely heard.[15] What it heard were misrepresentations of fact, mischaracterizations of evidence, and omission of the necessary fact of Defendant's status as an undercover informant. The prejudice to Defendant lies in the probability that the Government would have failed to secure an indictment without employing these falsehoods.

For example, the Government alleges that DEA had been investigating Defendant in earnest since June of 2009.[16] DEA Agent Goumenis stated this in an Oct. 14, 2010 email to

---

[15] As stated above, Defendant would ask for leave of the Court to supplement this submission in the event that his appeal is successful and the Grand Jury materials become available for inspection.

[16] The indictment alleges that the timeframe of the conspiracy was between October 2006 and February 2012. The Government has not provided any evidentiary basis for the state date of the alleged conspiracy.

10

Special Agent Monks, one of the Defendant's primary ICE handlers, instructing him to forward

all the information ICE had with regard to Defendant's cooperation with ICE ████████████

███████████████████████ Agent Goumenis reiterated that this investigation had

been opened since 2009 in his affidavit in support of Defendant's extradition.[18] It is therefore

likely that this was presented to the Grand Jury as a fact. It is not a fact. It is false. There was no

investigation of Defendant by DEA or otherwise which began in 2009. The Brady emails show

that ICE went to great lengths to verify that Defendant was not the subject of any investigation

by any agency of the United States or Colombia.[19]

Defendant is not alone in speculating that DEA's investigation was an empty husk or that

the conspiratorial acts alleged arose from Defendant's infiltration activities. The *Brady* emails

show that ICE Agents were also similarly perplexed by where these allegations from DEA were

coming from and were keenly aware that they could be based on Defendant's tasked directives.

Agent Burrola said as much in a *Brady* email instructing Agent Monks to compile a report of

everything Defendant had done and been instructed to do by ICE, warning: ████████████

████████████████████████████████████████████████[20]

Agent Monks agreed, recommending a meeting with DEA and the AUSA's involved so that they

---

[17] See BS# 000278

[18] See Goumenis Affidavit.

[19] These are some excerpts in which ICE agents describe their thorough vetting of Defendant and their confusion
about how DEA's investigation, which supposedly started in June 2009, could have gone undetected:
Oct. 4, 2010 - ████████████████████████████████████

████████████████████████████████
[BS# 000271]
Oct. 14, 2010 - ████████████████████████████████

████████████████████████████ [BS# 000296]

[20] See BS# 000268

would know the full scope of Defendant's authorization and contribution to U.S. interests.[21] In an exchange with ICE Attache in Bogota Luis Sierra, Agent Burrola affirmatively states that the allegations were fabrications and that US Attorney's in New York wanted him to "make stuff up". Bristling at the suggestion, he said he would do no such thing and reiterated that Defendant had been cleared by multiple agencies, databases, and de-confliction systems.[22] Lastly, Burrola noted the absurdity of DEA's claim that it had an open file on Defendant since June 2009 given that the DEA Case Agent and Supervisor in Bogota attended both debriefings with Defendant in Cartagena, Colombia[23] in November 2009 and April 2010.[24] There, they saw fit to task him with active measures[25] and ultimately supported his registration as confidential source.

What's more, the scant evidence provided in discovery in this case seems to bear out Monks', Burrola's, and Defendant's suspicions that the Government's determination that he was

---

[21] BS# 000268:



[22] BS# 000274:

[23] See BS# 000290

[24] Because it would have been dangerous to meet with agents directly, Defendant hired an attorney out of Houston named Eric Sunde to work out the particulars of his cooperation and ensure that he was dealing with legitimate and authorized elements of American law enforcement. In his deposition before undersigned counsel, Sunde stated that he made clear to ICE Agent Monks that Defendant had returned to Colombia in early 2009 at the behest of U.S. government entities, namely IRS, to infiltrate the Urabenos and that he was receiving direct taskings from them as early as late-2008. See excerpt from Eric Sunde's deposition, pp. 20-21 attached hereto as Exhibit H.

[25] BS# 000388 -



a murderous BACRIM leader was never the product of a real and substantive investigation by DEA, but a specious allegation. Such an investigation-- one commencing in June 2009 and ending in mid-2012--would presumably have produced untold volumes of material containing hundreds of DEA-6 reports, witness transcripts, case reports synthesizing case agents' findings, etc.

Not so in Defendant's case, it seems. The Government has produced, as evidence probative of its case-in-chief, two hundred and eight (208) pages of documents and fourteen (14) CDs.[26] Of those 208 pages, 114 consist exclusively of pictures of people's faces; not of contraband or drug labs or locations or anything that one would expect of a three-year, two-country investigation into a major drug kingpin. It includes only 8 DEA-6 reports, and no case report[27], each containing transcripts of Blackberry Message conversations, the earliest of which was drafted in December of 2010; two months after the DEA, Colombia, and the U.S. Attorney's Office had already determined that he was a BACRIM leader. Defendant is not a party to any of the conversations transcribed, only appearing in editorial as being attributed to a third-person alias. Conveniently, he is also named in the reports as the leader of the "Lopez-Londono Drug Trafficking Organization".[28] The characterization of the organization as "belonging" to Defendant is a clever way of connecting him to these conversations where no literal connection exists.

---

[26] At the status conference of January 19, 2017, Government counsel informed the Court that they had provided all the evidence it had in support of its case-in-chief. All subsequent discovery received by Defendant was produced pursuant to Court order based on Defendant's Brady demands.

[27] Case reports are routinely prepared by DEA in cases such as this one. They provide a summary of the evidence and an outline of the case. That one was not produced in this case is highly irregular.

[28] BS# 000538: A DEA summary of the November 2009 meeting with Defendant in Cartagena, Colombia characterized the DTO which the Government now claims is the Defendant's DTO as the "Macaco DTO". There is no evidence contained in the discovery alleging that some kind shifting of power occurred between 2009 and 2010.

Further proof of the illusory and fabricated nature of the allegations against Defendant is contained in the videotapes. In Agent Goumenis' Affidavit in Support of Extradition, he states: "It was clear from the [videotaped] conversations that the drug loads were being transported on behalf of the Lopez-Londono DTO/MTO." The video footage, recorded by an undercover CI whose identity remains undisclosed, depicts several members of the Urabenos engaged in conversations about drug trafficking or drug routes. Defendant is conspicuously absent.[29] In all the tapes, the ONLY mention of Defendant is made by the CI himself who invokes Defendant's name in order to secure buy-in from others on a drug conspiracy. Defendant is not mentioned in any other material way.[30] After a thorough analysis by defense counsel, it is evident that these videotapes do not contain a scintilla of support for Agent Goumenis' sworn-to allegation. If this falsehood was presented to the Grand Jury as fact, it would be but one more gross misrepresentation in an already demonstrably tainted and constitutionally deficient process.

It is with this context in mind that disclosure to the Grand Jury of Defendant's status undercover informant would have been absolutely essential to preserving what remained of its deliberative, constitutional function. Without that fact, the danger that conduct undertaken by Defendant in pursuit of his tasks by the Government would be mistaken for an act in furtherance of a drug trafficking conspiracy was extremely high. So high in fact that it is exactly what happened.

One of the few concrete allegations made by Agent Goumenis in his affidavit provides a paradigmatic example: "In March of 2010, after successfully completing this series of 300 kilogram drug trafficking ventures, Lopez-Londono held a meeting with maritime transporters to

---

[29] The Government has already stipulated to the fact that he does not appear on any tape anywhere.

[30] Defendant is aware of the difficulty of proving a negative, but the analysis of the tapes by defense counsel has been thorough. He will leave it to the Government in its response to show otherwise.

14

arrange further shipments. During the meetings, Lopez-Londono requested assistance with the transportation of cocaine from Gulf of Uraba, Colombia, to Panama, on behalf of Mexican buyers." The Government has provided NO evidence of these 300 kilogram drug shipments. All that's left to be proven from this allegation was that he was at meetings with drug traffickers in March 2010.[31]

To this point, on March 25, 2010, ICE agents tasked him with finding out who was behind a car bombing of a police station in Colombia the day before. The next day, March 26, 2010, he had the answer: the order was given by Luis Enrique Calle Serna, a reputed drug lord known as "Comba". It was an assassination attempt on a federal prosecutor as revenge for the recent arrest of a cohort. A formal report was generated and disseminated agency wide based on this intelligence.[32] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Defendant did not glean this intelligence, intelligence that the U.S. Government availed itself of and benefitted from, by searching Google. It was obtained by doing what the

---

[31] Since there are no tapes or objective evidence regarding what he did or said at this meetings, the Government will almost certainly be established with the use of testimony by inmates solicitous of a sentence reduction.

[32] BS# 000372-000373
[33] BS# 000381-000385

Government instructed him to do: getting close; and in getting close putting his life and the lives of his family in danger.[34] Could the Defendant have been exceeding his authority and actually trafficking drugs on the side? Sure. But the Government chose not to allege that. It chose, instead, to make it easy on themselves, keep the Grand Jury in the dark regarding Defendant's status, and spare themselves the whole ordeal of setting forth the scope of Defendant's authorization and providing actual evidence of how he exceeded it.

It is clear that the DEA determined that Defendant had to be indicted before it ever had a single piece of evidence against him. And so it decided to portray him as the leader of the criminal band and that everyone caught on tape worked for him.

If these misrepresentations were presented to the Grand Jury as fact, if it was lied to about the commencement of the investigation, if it was lied to about the character of the evidence, if it was lied to about the true nature of the alleged conspiratorial conduct, this indictment is irretrievably marred by prosecutorial misconduct, rendering it constitutionally infirm. Therefore, the superseding indictment must be dismissed.

## REQUEST FOR EVIDENTIARY HEARING

Based on the foregoing, a number of factual issues remain undetermined, making an evidentiary hearing essential. Most notably, Defendant must be afforded an opportunity to determine if ICE Agents Monks and Burrola complied with DEA and USAO's request to hand over all evidence, including the Blackberry devices, that would support Defendant's public authority defense. Additionally, he must have the opportunity to question the DEA agents who testified before the Grand Jury regarding the falsehoods outlined above. Courts in the Southern District of Florida granted evidentiary hearings on motions to dismiss in the past. See *United States v. Fla. West Int'l Airways, Inc.*, 853 F. Supp. 2d 1209 (S.D.Fl. 2011).

---

[34] Agents acknowledge in several emails the risk to Defendant's own life.

## CONCLUSION

Defendant is aware that the relief sought is an extraordinary remedy. But this is an extraordinary case. Defendant has demonstrated the brazen destruction of evidence; an effort motivated, in the Government's own words, by the desire to clear any roadblocks to a successful prosecution. The Government has cut corners in this case at every turn in order to save themselves unneeded effort and ensure their desired outcome. Instead of reckoning fairly with the exculpatory evidence in this case, they chose to destroy it. Instead of being forthright with the Grand Jury they hid his status as an informant. Instead of finding new evidence, they repurposed his tasked infiltrations as acts in aid of a criminal conspiracy to traffic narcotics. They knew if they could eviscerate his public authority defense, it was their word, and the word of a hundred reduction-seeking inmates, against his.

Defendant can no longer present a full and fair defense in this case. Deprived of the only evidence that would set forth the true scope of his public authority defense, the Government can simply tinker with its margins.

Accordingly, this indictment fails for want of due process.

WHEREFORE, the Defendant respectfully requests this Honorable Court dismiss the superseding indictment in this case and grant an evidentiary hearing.

Respectfully submitted,

/s/ Arturo V. Hernandez
Arturo V. Hernandez, Esq.
Fla. Bar No. 0324078
ARTURO V. HERNANDEZ, P.A.
40 N.W. 3rd Street, Suite 200
Miami, Florida 33128
Telephone: (305) 579-4850
Facsimile:  (305) 381-6869
E-Mail: avhlaw@bellsouth.net

17

CERTIFICATE OF CONFERRAL

The undersigned certifies that on July 12, 2017 he spoke with Assistant U.S. Attorneys Michael Nadler and Robery Emery, who oppose this motion. The parties agreed that a redacted copy of this motion would be filed publicly and an unredacted copy would be filed under seal together with the exhibits.

CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that this motion was filed with the Court's electronic filing system on July 12, 2017, and that an unredacted version will be filed under seal together with the exhibits on July 13, 2017.

/s/ Arturo V. Hernandez

Arturo V. Hernandez, Esq.

18