UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 10- 20763-GRAHAM/GOODMAN

UNITED STATES OF AMERICA,

    Plaintiff,
vs.

HENRY DE JESUS LOPEZ LONDONO,

    Defendant.
_____/

**DEFENDANT HENRY DE JESUS LOPEZ LONDONO'S**
**SENTENCING MEMORANDUM**

**I. BACKGROUND and PERSONAL HISTORY OF HENRY LOPEZ LONDONO**

Henry de Jesus Lopez Londono was born in Medellín, Colombia in 1971 and is currently 48 years old. He has been together with his wife Doris Lopez Valencia for approximately 15 years and they have been married for seven years. He is the father of five children, three of them minors ages 6, 12 and 15 years old. He grew up in a family of eight children (of which one died a victim of violence at age 17) and at the age of four he lost his father in a work related accident. Due to the death of his father, Henry had to drop out of high school at the age of 14 to work in order to help his mother support his family. After that he worked for a contractor for the Coca-Cola Company for several years.

Since 1996, he was active in the Social Pastoral of the Roman Catholic Apostolic Church of Medellin, an organization that together with the Municipal Administration of that city, brought about the Mediation Project which helped resolve conflicts between

1

organized criminal gangs. It was within the framework of his participation in this Project, that the United Self-Defense Groups of Colombia (hereinafter, AUC) began to follow Henry's activities and recruited him to be part of the Political Wing of the organization. He was never part of the military ranks.

On August 28, 2005, Henry demobilized in the framework of the Peace Process between the National Government of Colombia and the United Self-Defense Groups of Colombia. After his demobilization in 2005, Henry began a process of reincorporation into civil life. The Reintegration Programs were designed and directed by the Colombian Government, the Organization of American States (hereinafter, OAS) and some public and private institutions. The Programs provided job training. Subsequently, Henry created two Non-Governmental Organizations: SEEDS OF PEACE AND COLOMBIA and GREEN PRODUCTION. The first focused on the individual monitoring of the demobilized, to ensure the successful reintegration of the latter into civilian life. The second's objective was to train former combatants for reinsertion in the workplace and reparation to the victims of the conflict. The dynamics of these NGOs led Henry to work jointly with regional authorities, private companies, educational institutions, the media and the community in general, which led to the creation of a Working Table with the purpose of recomposing the moral and social fabric. Thus, the Working Table BUILDING the FUTURE OF REGION was inaugurated, with Henry as its Director. The official seat of the Working Table was the seat of the Council of the Municipality and the activities were endorsed by the National Government of Colombia and by the OAS through its delegates in Colombia.

After denouncing unlawful acts of official corruption, the members of the Working Table experienced harassment, attacks and extrajudicial political persecution by the Colombian National Police, which led to an extraordinary meeting between the regional authorities, the members of the Working Table and the High Commissioner for Reintegration, Dr. Frank Pearl. In this meeting, the corresponding complaints were exposed. But the denunciations caused the opposite effect and the political persecution increased.  Henry made the decision to flee his country with his wife and two year old son because the situation had become so dire and people in his close working circle had been kidnapped and had disappeared.  Thus, in mid-2007, when Henry arrived in Argentina in a grave situation, feeling persecuted and unfamiliar with the environment, the collection and presentation of his evidence for asylum was delayed. After several months of working together with lawyers Nino Arena and Pablo Vimo, on April 18, 2008, Henry presented his formal Request for Political Asylum before the Refugee Eligibility Committee (hereinafter Ce.Pa.Re), in Buenos Aires, Argentina. The Request for Political Asylum was assigned No. 599238/2008. See Exhibit A, Excerpts from Report of Henry Lopez Londono's Asylum Petition in Argentina and English Translation.

Since arriving in up Argentina until April 2008, Henry had gone to Ce.Pa.Re. various times to find out the requirements for the initiation of the procedure. It was at the official headquarters of Ce.Pa.Re, where he met again with Carlos Mario García Avila, a former member of the AUC.

Towards the middle of 2008, Carlos Mario García Avila told Henry about his relationship with a person named Roberto Luna, who identified himself as a member of a U.S. security agency.

This person expressed to Carlos Mario Avila the interest of the authorities of the Department of the Treasury of the United States of America, to offer Henry asylum in exchange for intelligence information on Colombian criminal groups. In August 2008, Henry officially consulted with Ce.Pa.Re, to determine if the possible cooperation with American law enforcement/security agencies could hinder his asylum process. Finally, Ce.Pa.Re issued Resolution 515/2008 recognizing the founded fear of persecution to Henry and his family, but only granted asylum to the wife and minor child because of Henry's past affiliation with the AUC.

Although Henry appealed the asylum exclusion decision (and therefore maintained the "status of refugee claimant" until the day of his extradition to the U.S.), in late 2008, Henry delegated to a Colombian lawyer (Eduardo Lopera) and an American-Argentine lawyer (Aldo Spicacci), the task of verifying whether the proposal made by Roberto Luna was an official proposal of the Department of the Treasury of the United States. Eduardo Lopera coordinating with Roberto Luna, sent Aldo Spicacci from Argentina to the United States of America to corroborate this proposal. Spicacci met with S/A Santiago Aquino (in January 2009), a member of IRS agency, who confirmed in that meeting their relationship with Roberto Luna on behalf of the United States Department of the Treasury. He corroborated the proposal as an official proposal. Aldo Spicacci returned to Argentina and confirmed to Henry the veracity and officiality of the proposal, delivering

as proof of the meeting, an institutional card of the Department of the Treasury, with Santiago Aquino's contact information. At the risk of deportation from Argentina, Henry accepted the proposal to infiltrate criminal gangs by Roberto Luna on behalf of the Treasury Department of the United States of America.

Since the year 2005 Colombian criminal case 59.397 was processed and continued against Henry and more than 40 co-defendants. This case was based on an investigation of the DEA SIU Bogota Unit and DIJIN-PNC. The indictment charged drug trafficking, conspiracy to commit a crime, and the formation of criminal gangs. Henry was acquitted of all charges in Colombia in 2010.

## II. GUIDELINE CALCULATION

### A. Specific Offense Characteristic Increases Are Not Applicable

The Based Offense Level is correctly calculated at a level 38. However, as detailed in his Objections to the PSIR and Motion for Downward Variance, Henry Lopez Londono should not receive the following three increases for specific offense characteristics: 2D1.1(b)(1) for use of a firearm; 2D1.1(b)(2) for use of violence; and 2D1.1(b)(3) for use of an aircraft because they do not apply and they were not proven at trial.

Once a defendant objects to a fact contained in the PSIR at sentencing, the Government bears the burden of proving that disputed fact by a preponderance of the evidence. United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir. 2005); see also United States v. Martinez, 584 F.3d 1022, 1027 (11th Cir. 2009) ("It is by now abundantly clear that once a defendant objects to a fact contained in the PSIR, the

government bears the burden of proving that disputed fact by a preponderance of the evidence."). This Court has explained that "the preponderance standard is not toothless. It is the district court's duty to ensure that the Government carries this burden by presenting reliable and specific evidence." United States v. Bernardine, 73 F.3d 1078, 1080 (11th Cir. 1996). The preponderance of evidence is a "relaxed evidentiary standard, however, it does not grant the court a license to sentence a defendant in the absence of sufficient evidence when that defendant has properly objected to a factual conclusion." Rodriguez, 398 F.3d at 1296.

### B. Role Enhancement is Not Applicable

As detailed in his Objections to the PSIR and his Motion for Variance, Henry Lopez Londono should not receive a 4 level enhancement pursuant to § 3B1.2 in this case. There should be neither an aggravating nor a mitigating role adjustment should be applied in this case.

### C. Adjustment for Obstruction of Justice is Not Applicable

As detailed in his Objections to the PSIR and his Motion for Variance, he should not receive a 2 level enhancement pursuant to §3C1.1.

### D. Specialty Doctrine Bars These Enhancements

As the Defendant's Post Verdict Motion for Judgement of Acquittal Motion Pursuant to Rule 29 and for Arrest of Judgement Pursuant to Rule 34 details, the alleged acts of violence and use of a firearm adduced at trial from cooperating informants are not only separate substantive uncharged crimes, but also sentencing enhancers which were

6

not presented or authorized for extradition. The only crime permissible in Henry Lopez Londono's extradition was conspiracy to distribute 5 kilograms of cocaine.

Although the defense recognizes that the 11th Circuit has held that a sentencing court can normally consider other conduct for which the defendant was not extradited to enhance a sentence without violating the Rule of Specialty as stated in United States v. Garcia, 208 F.3d 1258 (11th Cir. 2000) vacated and remanded for reconsideration by Garcia v. United States, 531 U.S. 1062, 121 S. Ct. 750, 148 L. Ed. 2d 653 (2001), and affirmed by United States v. Garcia, 251 F.3d 160 (11th Cir. 2001)("The short answer is that defendant was not punished for crimes other than those for which he was extradited because under our law, the consideration of other conduct in the sentencing process is legally and conceptually a part of the punishment for the inducted crimes and within the limits set for those crimes."). This 11th Circuit precedent should not apply in this case because the drug conspiracy upon which Henry Lopez Londono was extradited was a merely a façade presented to the Grand Jury and the Country of Argentina to proceed to trial based upon completely different substantive charges (violence, firearms, etc.. ) under an all-encompassing " over-arching conspiracy" in order to bootstrap these unsubstantiated, uncharged, other crimes into evidence. The reason it was a façade was because the Government was aware that Henry Lopez Londono was authorized to conspire with drug traffickers (the entire basis of the Indictment) and knew this conspiracy alone could not stand under the public authority defense. Because of this knowledge and trial strategy the Government violates the Rule of Specialty by now trying to enhance the sentence with "other conduct" which they intentionally did not bring to

7

Argentina in the extradition process. This is not the situation contemplated in Garcia and at this time should be barred by the doctrine of specialty.

### E. The Correct Total Offense Level Calculation Should be a Level 38

As detailed in his Objections to the PSIR, his Motion for Variance and above, the Total Offense Level should be a Level 38 with a corresponding sentencing guideline range of 235-293 months (19.5 -24.4 years) in prison.

## III. REQUEST FOR SPECIFIC DEPARTURES

### A. Departure for Pretrial Confinement Pursuant to U.S.S.G. § 5K2.0

Many courts have recognized and applied a Downward Departure pursuant to U.S.S.G. § 5K2.0 for harsh and severe conditions spent in pretrial or presentence confinement. See U.S. v. Carty, 264 F.3d 191 (2d Cir. 2001) (finding that defendant's pre-sentence confinement in Dominican Republic where conditions were bad may be a permissible basis for downward departure). The Court in Carty stated, "The Sentencing Commission has not categorically proscribed consideration of this factor, and we cannot say that conditions of pre-sentence confinement may not be so severe as to take a particular case "outside the heartland of the applicable Guideline." According to the Sentencing Guideline Manual, a sentencing court may depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. 3553 (b)). No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission

8

contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities. See United States v. Francis, 129 F. Supp. 2d 612, 616 (S.D.N.Y. 2001)("Accordingly, we hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.")

Our own 11th Circuit Court of Appeals first recognizes this departure in U.S. v. Pressley, 345 F.3d 1205 (11th Cir. 2003) (where the defendant spent six years in presentence confinement, including 5 years in 23-hour a day lockdown and where he had not been outside in 5 years, district court erred in holding that departure not available) and stated, "Conditions of confinement could provide a basis for departure, since this factor was apparently not taken into account by the Sentencing Commission and could be unusual enough to take a case out of the heartland of the applicable guideline."

As explained in his Motion for Downward Variance, Henry Lopez Londono was subject to inhumane conditions of imprisonment in Argentina awaiting extradition for four years. See Exhibit B, Affidavit of Maria Gabriela Ricagno, paragraph 13 detailing the conditions of Lopez at Ezeiza prison in Argentina and Exhibit C, Affidavit of Daniel Bladimiro Fedel[1] at paragraph 13.

The uncontroverted evidence of the unusually inhumane conditions that Lopez specifically suffered for such a long period of years takes this particular situation out of

---

[1] Fully executed and notarized copies of these two Affidavit, Exhibits B and C, and a certified English translation will be filed under a separate notice of filing prior to sentencing. These affidavit addresses the following topics: the conditions of Henry Lopez Londono's incarceration in Argentina awaiting extradition; the doctrine of specialty, the limitations of Lopez' extradition and punishment permissible pursuant to the extradition, the hierarchy of law in Argentina and international norms; the residency of Lopez in 2007 and 2008.

the "heartland" of cases and warrants (not only the day for day credit for the time he already served) but *additional* credit by way of a separate downward departure for pretrial confinement.

## IV. REQUEST FOR DOWNARD VARIANCE

As detailed in his Motion for Downward Variance, this Court should vary downward from the guideline range pursuant to Title 18 U.S.C. Section 3553(a) because the PSIR guideline is inherently unreasonable, excessive and would result in a sentencing disparity that would not account for the substantial assistance he provided before his arrest.

## V. THE RULE OF SPECIALTY PREVENTS THIS COURT FROM SENTENCING HENRY LOPEZ LONDONO TO A LEVEL 43 GUIDELINE SENTENCE OF LIFE

### A. Doctrine of Specialty

The doctrine of specialty generally provides that a criminal defendant extradited from one country to another may be tried only for the offenses for which he or she has been surrendered. The doctrine is explicitly memorialized in most, if not all, U.S. extradition treaties.

The United States Supreme Court's 1886 decision in United States v. Rauscher, 119 U.S. 407 (1886), recognizes a criminal defendant's standing to assert a challenge under the doctrine of specialty. Rauscher stands for the principle that a defendant extradited to the United States has standing to invoke the doctrine of specialty, even in the absence of a protest by the surrendering government.

The 11th Circuit follows Rauscher. Although the federal circuits have been divided on whether an extradited defendant has a right to enforce an agreement between the surrendering nation and the United States, in the 11th Circuit the defendant has the right to contest a breach of such an agreement. In United States v. Puentes, 50 F.3d 1567 (11th Cir. 1995), the Court stated, "We hold that a criminal defendant has standing to allege a violation of the principle of specialty. We limit, however, the defendant's challenges under the principle of specialty to only those objections that the rendering country might have brought." Id. at 1572 "An individual extradited pursuant to an extradition treaty has standing under the doctrine of specialty to raise any objections which the requested nation might have asserted." Id. at 1575.

### B. The Doctrine of Specialty Applies at Sentencing

In addition to limiting the charges on which an extradited defendant may be prosecuted, an extension of the doctrine of specialty has been applied to give effect to conditions on extradition imposed with regard to sentencing. See United States v. Cuevas, 496 F.3d 256, 262 (2d Cir. 2007) (court recognized that the "rule of specialty has application in the sentencing context as well"). Such conditions can include, for example, that the United States not sentence the defendant to death or to life in prison. Sometimes the sentencing condition is asserted unilaterally by the surrendering government; at other times there is an agreement between the United States and the surrendering government, set forth in diplomatic correspondence, concerning the sentence. See United States v. Stokes, 726 F.3d 880, 889 (7th Cir. 2013).

### C. Extradition Documents, Communications and International Consequences Must Be Analyzed

In order to determine the terms and agreements of extradition between the two nations, courts have analyzed the surrounding documents and the international impacts of a sentencing decision. In United States v. Campbell, 300 F.3d 202 (2d Cir. 2002), the Court looked to the Extradition Decree from the surrendering nation and subsequent Consular clarifications of the language "not be sentenced to serve a term of imprisonment greater than 50 years". The Judge sentenced the defendant to 155 years and ordered him released after serving 50 which complied with the extradition agreement. Id.

Courts will look not only to the extradition order, but also to the diplomatic communications between the countries when determining the sentencing terms of extradition. See United States v. Baez, 349 F.3d 90 (2d Cir. 2003) (Court analyzed diplomatic notes to determine that the assurances contained therein were followed). Although the sentence was affirmed because it was not technically in violation of the wording of the agreement, the Second Circuit was critical of the district court's apparent view that it was free to ignore the consequences of an extradition agreement. Id. at 93. The court observed:

> [W]e disagree with the manner in which the District Court construed the Diplomatic Note at issue. The Court erroneously suggested that it could ignore the consequences of an extradition agreement between Colombia and the United States because the Judiciary is a branch of our tripartite government independent of the Executive branch.
> The Judiciary is unquestionably independent of the Executive. However, the cauldron of circumstances in which extradition agreements are born implicate the foreign relations of the United States. Id.

12

Specifically, in a sentencing context, the U.S. Courts are mindful of international obligation, comity and far reaching implications. "After all, if the United States wishes to protect its own citizens from bait-and-switch prosecutions when they are extradited for trial in a foreign nation, so too must it honor the same limitation in the reciprocal situation." United States v. Day, 700 F.3d 713 (4th Cir. 2012). The doctrine of specialty "is based on principles of international comity: to protect its own citizens in prosecutions abroad, the United States guarantees that it will honor limitations placed on prosecutions in the United States." United States v. Andonian, 29 F.3d 1432 (9th Cir. 1994).

> In sentencing a defendant extradited to this country in accordance with a diplomatic agreement between the Executive branch and the extraditing nation, a district court delicately must balance its discretionary sentencing decision with the principles of international comity in which the rule of specialty sounds. Courts should accord deferential consideration to the limitations imposed by an extraditing nation in an effort to protect United States citizens in prosecutions abroad. Andonian, 29 F.3d at 1435. Moreover, in evaluating the exact limitations set by the extraditing nation, courts should not elevate legalistic formalism over substance. To do otherwise would strip comity of its meaning. Baez at 91.

**D. Analysis of the Limitation on Extradition in Henry Lopez Londono's Case**

Similarly, this Court must look to and interpret the Extradition Treaty between the United States and Argentina, the Extradition Hearing and Order from the Argentinian Court and the diplomatic communications between the countries. See Exhibit D, Diplomatic Notes.

The Presentence Investigation Report indicates the guideline range in this case is a level 43 which is life in prison. However, pursuant to this specific extradition agreement, Lopez may not be sentenced to life and accordingly, should be sentenced to a term of imprisonment, taking into consideration his age, which would permit his release during his natural life.

The treaty between the United States and Argentina lays out the doctrine of specialty in Article 16, "A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for: (a) the offense for which extradition was granted or a differently denominated or less serious offense based on the same facts on which extradition was granted." See Exhibit E, 1997 Extradition Treaty between Argentina and the United States.

Henry Lopez Londono was also extradited from Argentina on November 17, 2016, pursuant to the judicial extradition order signed by Judge Sebastian Roberto Ramos on May 19, 2016, after an extradition hearing that set out conditions and limitations on the extradition. See Exhibit F, Extradition Order and English Translation.

Finding VII of the Extradition Order permits Henry Lopez Londono only to be prosecuted for conspiracy to distribute 5 or more kilograms of cocaine. No other crime is mentioned in the Extradition order. Id.

Finding IX of the Extradition Order specifically incorporates and adopts in this order compliance with the guarantees indicated by the defense at the evidentiary hearing. Id.

At this evidentiary hearing the defense indicated the following guarantees that were made part of this Extradition Order:

> In the event that the Honorable Judge considers that extradition should proceed, the guarantees provided for in article 66 of the international cooperation law are requested (...) I request that the guarantees of art. 18 of the law of international criminal cooperation, which is not extradited to another state without your authorization. And that the penalty applied in the event that extradition is granted, should be adapted to the "conventional standards" adopted by the Argentine Republic, (...) This is without prejudice to the fact that the defendant has a refugee process in process" Quoted from a Video Excerpt of the Petition Hearing which will be filed conventionally with an English translation under separate filing.

The conventional standards adopted by Argentina with reference to sentencing referred to in these guarantees include, Article 66 of the Law on International Cooperation in Criminal Matters which states, "The term of deprivation of liberty required by the extradition process shall be counted as provided in section 24 of the Argentine Penal Code." The Argentinian Penal Code does not permit a sentence of life imprisonment to be imposed. As explained in Exhibit B, Affidavit of Maria Gabriela Ricagno, the maximum period of imprisonment for those sentenced to life is 35 years but in order to be constitutional this maximum must take into account the defendant's age to permit the real chance for the defendant to obtain release into society. This is based upon conventional international standards adopted by Argentina such as the Convention against Torture and other Cruel, Inhumane or Degrading Treatment or Punishment which bars a defendant from being condemned to die in prison.   See Id. and Exhibit C, Affidavit of Daniel Bladimiro Fedel. Further, the Argentinian law provides that

extradition will not be permitted where there is reason to believe a person may be subject to a cruel, inhumane or degrading sentence, which a life sentence would be under these international treaties that Argentina recognizes in their local law. See Exhibit B, Affidavit of Maria Gabriela Ricagno and Exhibit C, Affidavit of Daniel Bladimiro Fedel.

Although, the U.S. Code and the Sentencing Guidelines permit a maximum sentence of life imprisonment for the offense which Lopez was convicted, these specific guarantees against this type of punishment were incorporated in the judicial order of extradition under which Lopez was extradited. Therefore, this Court is prohibited from imposing a guideline sentence of life and requires a sentence that will permit Henry Lopez Londono to be released in his natural life with time to reenter society and be rehabilitated.

## VI. SENTENCING REQUEST

In conclusion, Henry Lopez Londono requests this Honorable Court grant the above requested departures and variances and consider his sentence in light of the assurances that were made to the Country of Argentina to arrive at a sentence of 19.5 years, which would be a sentence within the guideline range at an offense level 38. At the age of 48, this would permit him to be released at the age of 68 years old and then returned to Argentina as contemplated by the extradition order.

    Respectfully submitted,

    By: /s/ Arturo V. Hernandez
        Arturo V. Hernandez, Esq.
        Fla. Bar No. 0324078

ARTURO V. HERNANDEZ, P.A.
Courthouse Center
40 N.W. 3rd Street, Suite 200
Miami, Florida 33128
Telephone: (305) 579-4850
Facsimile: (305) 381-6869
E-Mail: avhlaw@bellsouth.net

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that a true and correct copy of the foregoing Sentencing Memorandum was filed through the Court's electronic filing system on this 8th day of June, 2018.

Respectfully submitted,

By: /s/ Arturo V. Hernandez